# STATE OF CONNECTICUT *v.* RICHARD G. DABATE
## (SC 20749)

Mullins, C. J., and McDonald, D'Auria, Ecker,
Alexander and Dannehy, Js.

*Syllabus*

Convicted of murder, tampering with or fabricating physical evidence, and making a false statement in connection with the shooting death of his wife and his alleged staging of the crime scene to replicate a home invasion, the defendant appealed to this court. The defendant claimed, inter alia, that multiple instances of prosecutorial impropriety deprived him of his right to a fair trial. *Held*:

351 Conn. 428    MARCH, 2025    429

State *v.* Dabate

Although the defendant established four distinct instances of prosecutorial impropriety, this court concluded that those improprieties did not, either individually or collectively, deprive him of a fair trial.

With respect to certain instances in which the prosecutor allegedly did not comply with trial court rulings, the prosecutor did not violate those rulings when he questioned the defendant about his finances and whether he was a "ticking time bomb," but the prosecutor's failure to rephrase his question about whether the defendant was "trying to create a little mini Cheshire scene" was improper, as the reference to the word "Cheshire" was in direct violation of the court's order not to use that word, and the question was unnecessarily inflammatory because it compared the defendant to other notorious offenders or infamous figures.

With respect to certain instances in which the prosecutor allegedly violated *State* v. *Singh* (259 Conn. 693) by purportedly asking the defendant to comment on other witnesses' testimony, none of the prosecutor's questions violated *Singh* because the prosecutor did not ask the defendant to characterize another witness' testimony as wrong, mistaken or a lie, or imply to the jury that it must find that the witness had lied in order to find the defendant not guilty; rather, the prosecutor sought to impeach the defendant's testimony with inconsistencies in light of other evidence, and the prosecutor's questions were unlikely to confuse the issues and did not shift the state's burden of proof.

With respect to the prosecutor's allegedly improper use of uncharged misconduct evidence, the prosecutor's questions regarding the defendant's drinking habits, his withdrawing his children from therapy, and the fact that the children were no longer in his care were proper inquiries for impeachment during cross-examination, as the prosecutor had a good faith basis for them in light of the evidence, and that line of questioning did not serve to establish the bad character, propensities, or criminal tendencies of the defendant.

The prosecutor's question regarding whether the defendant had planned to kill the victim during a trip to Vermont shortly before the murder, however, was improper, as the prosecutor did not establish a proper foundation for the question by stating a good faith belief that there was an adequate factual basis for his inquiry.

With respect to certain alleged improprieties committed by the prosecutor during closing arguments, although the prosecutor's comments that the victim had accused the defendant of stealing money from the family and that "truth in our society is under attack" were not improper, the prosecutor's comments that the defendant was counting on the jury to be gullible, lazy, and unintelligent were improper, as such comments served to inflame the jurors' passions and had the effect of diverting the jurors' attention from their duty to decide the case on the basis of the evidence before them.

State *v.* Dabate

The prosecutor's question concerning the defendant's failure to contact the police after the defendant read a published newspaper article about the victim's murder, which the defense had introduced at trial, did not constitute an improper comment on the defendant's exercise of his right to counsel but, rather, constituted proper impeachment of the defendant with evidence of his silence prior to his arrest and before his receipt of warnings pursuant to *Miranda* v. *Arizona* (384 U.S. 436).

With respect to the prosecutor's alleged violation of the rules of disclosure by failing to disclose the anticipated testimony of a certain expert witness that the defendant's injuries appeared to be self-inflicted, that nondisclosure did not violate *Brady* v. *Maryland* (373 U.S. 87) because the testimony was not exculpatory in nature, but the nondisclosure constituted an impropriety insofar as the prosecutor had failed to comply with his obligations under the rule of practice (§ 40-11 (a)) governing disclosure by the prosecuting authority, as the record indicated that the state was aware of the anticipated testimony for months prior to the trial and failed to disclose it, even though it would have been material to the preparation of the defense and was introduced as evidence in the state's case-in-chief.

Applying the factors set forth in *State* v. *Williams* (204 Conn. 523), this court concluded that the identified improprieties did not deprive the defendant of his right to a fair trial because there was not a reasonable likelihood that the jury's verdict would have been different in the absence of those improprieties.

This court declined the defendant's request to exercise its supervisory authority over the administration of justice to reverse his conviction as a sanction for the prosecutorial improprieties, as the four instances of impropriety did not impact the perceived fairness of the judicial system as a whole or warrant the extraordinary remedy of reversal under this court's supervisory authority.

The trial court did not abuse its discretion in admitting data from the victim's Fitbit activity tracker under *State* v. *Porter* (241 Conn. 57), as there was ample evidence in the record to support that court's findings that the professional credentials of the state's expert witness qualified him as an expert, that the witness' Fitbit study had been subject to peer review, that the Fitbit was generally accepted in the scientific community, that the Fitbit had been tested extensively and deemed accurate, and that the Fitbit had been developed for extrajudicial purposes.

The trial court properly denied the defendant's motion to suppress a statement that he had made to the police during an interview at the hospital.

There was ample evidence in the record to support the trial court's factual findings underlying its determination that the defendant was not in custody during the hospital interview for purposes of *Miranda*, and, moreover, the totality of the circumstances established that the defendant was not in

State *v.* Dabate

custody because a reasonable person in the defendant's position would not have believed that he was restrained to a degree associated with a formal arrest.

Argued October 30, 2024—officially released March 11, 2025

*Procedural History*

Substitute information charging the defendant with the crimes of murder, tampering with or fabricating physical evidence, and making a false statement, brought to the Superior Court in the judicial district of Tolland, where the court, *Hon. Julia DiCocco Dewey*, judge trial referee, denied the defendant's motion to preclude certain evidence and denied in part his motion to suppress certain statements; thereafter, the case was tried to the jury before *Klatt, J.*; verdict and judgment of guilty, from which the defendant appealed to this court. *Affirmed.*

*Trent A. LaLima*, with whom was *Virginia M. Gillette*, for the appellant (defendant).

*Nathan J. Buchok*, assistant state's attorney, with whom was *Matthew C. Gedansky*, state's attorney, for the appellee (state).

*Opinion*

ALEXANDER, J. A jury found the defendant, Richard G. Dabate, guilty of, among other offenses, murdering his wife in violation of General Statutes § 53a-54a in connection with a staged invasion of their home in Ellington. The defendant appeals[1] from the judgment of conviction, claiming that he is entitled to a new trial for the following reasons: (1) multiple instances of prosecutorial impropriety deprived him of his right to a fair trial; (2) the prosecutorial impropriety was so deliberate and flagrant that this court should exercise its supervisory authority over the administration of justice to reverse his conviction; (3) the trial court erred

[1] The defendant appealed directly to this court from the judgment of conviction pursuant to General Statutes § 51-199 (b) (3).

State *v.* Dabate

in admitting data obtained from the victim's Fitbit;[2] and (4) the trial court should have suppressed a statement given to the police because it was obtained in violation of his *Miranda*[3] rights. Although we agree with the defendant that the prosecutor engaged in multiple acts of impropriety at trial that we consider troubling, we conclude that those improprieties did not deprive the defendant of a fair trial. We also reject the defendant's other claims of error. Accordingly, we affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The defendant and the victim, Connie Dabate, were married in 2003 and had two children. In 2005, the defendant began an extramarital affair with Sara Ganzer. In June, 2015, the defendant learned that Ganzer was pregnant with his child. At that time, the defendant informed her of his intention to divorce the victim and that he had moved one half of his personal belongings out of the marital home. However, the defendant had lied to her and had not contacted a divorce attorney. The defendant did not attempt to divorce the victim because he was afraid that a divorce would be destructive to his personal finances and familial relationships. Motivated by these fears, the defendant instead decided to kill the victim and to make it appear as if an intruder had killed her in a home invasion.

On December 23, 2015, the victim left for the gym at 8:46 a.m. and, when she discovered that her gym class had been cancelled, returned home at 9:18 a.m. She then spoke to her mother on the phone, posted on Facebook, and messaged a friend. The defendant did not leave home that morning. He opened the basement

---

[2] A Fitbit is a "device that continuously tracks the wearer's steps and interfaces with the wearer's phone or computer." *State* v. *Burch*, 398 Wis. 2d 1, 6 n.1, 961 N.W.2d 314 (2021), cert. denied,    U.S.    , 142 S. Ct. 811, 211 L. Ed. 2d 503 (2022).

[3] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

State *v.* Dabate

door eight times and armed and disarmed the home security system multiple times. The defendant also placed his wallet outside near the basement bulkhead stairs. He then spent time answering work emails, playing music on his phone, and, when he heard the victim come home earlier than he expected, he checked the gym schedule. At 10:05 a.m., the defendant lured the victim to the basement and used a gun purchased a few months earlier[4] to shoot her. The Fitbit that the victim wore on her hip stopped registering any steps at that time.

To achieve the appearance of a home invasion, the defendant tied loose zip ties around his neck, ankles, and wrists, and used another zip tie to bind one of his wrists to a folding chair. The defendant also self-inflicted stab wounds to his thighs, chest, and finger with a box cutter. He activated the home's panic alarm and called 911. The defendant told the responding police officers that an intruder dressed in camouflage had entered their home and killed the victim. The police found the victim's body, the firearm used to kill the victim, a butane torch, a box cutter, burnt debris, and multiple droplets of blood in the basement.

The defendant was then transported to Hartford Hospital. Two state police detectives, Jeffrey Payette and Brett Langevin, interviewed the defendant at the hospital and obtained his statement about the events of that morning.[5] During the interview, the defendant did not

---

[4] In October, 2015, the victim and the defendant purchased a firearm after the defendant's vehicle had been vandalized several times. The defendant also purchased a second firearm; he stored one in a safe in the basement of their home and the other in the master bedroom closet.

[5] The defendant told the detectives that he had been attacked by a male intruder who had been hiding in an upstairs closet. He claimed that the intruder chased the victim into the basement and shot her with the firearm that belonged to the defendant and the victim. The defendant then stated that the intruder tied him up and began to cut and burn him with a box cutter and a blowtorch until he managed to push the blowtorch toward the intruder's face, causing the intruder to flee, and that he then called the police.

State *v.* Dabate

initially reveal his extramarital affair.[6] Because the detectives began to note inconsistencies in the defendant's account of the morning's events, they told him that his story would easily be contradicted with electronic records. The defendant ultimately requested counsel, and the detectives ended the interview.

Following an investigation, the police arrested the defendant in April, 2017. The state charged the defendant with one count of murder in violation of § 53a-54a, one count of tampering with or fabricating physical evidence in violation of General Statutes § 53a-155, and one count of making a false statement in violation of General Statutes § 53a-157b. Before trial, the state filed notices of its intention to introduce evidence of uncharged misconduct regarding (1) marital discord and infidelities, and (2) the defendant's financial irregularities. Over the defendant's objection, the trial court[7] allowed the state to introduce evidence regarding the marital infidelity. The court also permitted the state to inquire about assets in the victim's estate under the defendant's control but precluded the state from introducing evidence regarding an alleged embezzlement, a loan, the defendant's depletion of marital assets, and other financial misconduct after the victim's death.

The defendant moved to suppress his statement to the police during the hospital interview, claiming that he was in custody and that *Miranda* warnings were required. After an evidentiary hearing, the trial court denied the motion to suppress with respect to the majority of his statement, finding that the defendant was not in custody during the hospital interview.

---

[6] The defendant first claimed that he and the victim, unable to have another child, had arranged for Ganzer to be their surrogate. He then confessed that he had been having an affair "off and on [for] seven years" with Ganzer and that she was pregnant.

[7] All references in this opinion to the trial court are to the Honorable Julia DiCocco Dewey, judge trial referee, with respect to pretrial motions and to Judge Klatt with respect to the jury trial.

351 Conn. 428 MARCH, 2025 435

State *v.* Dabate

The defendant also filed a motion in limine to preclude the admission of data from the victim's Fitbit and requested a *Porter*[8] hearing at which the state would be required to demonstrate the reliability of the evidence. The trial court granted the defendant's request for a *Porter* hearing but, after conducting the hearing, denied the defendant's motion to preclude the Fitbit evidence, finding the evidence scientifically reliable on the basis of the testimony of Keith Diaz, a professor of behavioral medicine at Columbia University Medical Center.

The case was subsequently tried to a jury in a highly publicized trial. The state sought to prove that the defendant had murdered the victim and staged the home invasion to conceal his involvement in the crime. The state claimed that the defendant was motivated by his desire to extricate himself from his marriage without the need for a messy divorce, which inevitably would have exposed his extramarital affair, the unexpected pregnancy, and his financial difficulties. The state advanced this theory using, among other evidence, the defendant's statement and testimony from medical personnel who had treated him, a state police officer whose canine did not detect the scent of a third person at the house, and an examiner with the state forensic laboratory who found the defendant's DNA on the basement safe, the back of the folding chair, the handle of the gun, and the box cutter. The state also relied on evidence to establish a timeline that contradicted the defendant's version of events. This evidence included movement data from the victim's Fitbit that conflicted with the defendant's statement of when the shooting occurred and his claim that the victim had run from the intruder into the basement. The jury returned a verdict of guilty on all counts. The trial court rendered

[8] State v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998).

State *v.* Dabate

judgment in accordance with the jury's verdict and sentenced the defendant to a total effective sentence of sixty-five years of imprisonment. This direct appeal followed.

I

PROSECUTORIAL IMPROPRIETY CLAIMS

We first address the defendant's claim that he is entitled to a new trial because the prosecutor, the state's attorney for the judicial district of Tolland, Matthew Gedansky, committed numerous instances of impropriety. He contends that these improprieties (1) collectively deprived him of his due process right to a fair trial under the fourteenth amendment to the United States constitution, and (2) warrant reversal as a sanction pursuant to our supervisory authority over the administration of justice. The defendant alleges twelve instances of prosecutorial impropriety that generally are encompassed within six categories. These include when the prosecutor (1) did not follow court rulings, (2) repeatedly asked the defendant to comment on the veracity of other witnesses' testimony in violation of *State* v. *Singh*, 259 Conn. 693, 793 A.2d 226 (2002), (3) used uncharged misconduct evidence without providing advance notice, (4) made unduly inflammatory comments during summation, (5) commented on the defendant's assertion of his right to counsel, and (6) violated disclosure requirements under both our rules of practice and *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). We conclude that the defendant has established four distinct instances of prosecutorial impropriety but that they neither individually nor collectively deprived him of a fair trial. Additionally, although we do not condone Gedansky's conduct in the prosecution of this case, we nevertheless conclude that it does not warrant the extraordinary remedy of reversal under our supervisory authority.

State *v.* Dabate

When considering a prosecutorial impropriety claim, the court engages in a two step process. We must determine "(1) whether [impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived a defendant of his due process right to a fair trial." (Internal quotation marks omitted.) *State* v. *Coney*, 266 Conn. 787, 808, 835 A.2d 977 (2003). It is the defendant's burden to satisfy both steps. See, e.g., *State* v. *O'Brien-Veader*, 318 Conn. 514, 524, 122 A.3d 555 (2015). With respect to the second step, we must examine not only whether any individual impropriety deprived the defendant of his right to a fair trial, but also whether "the cumulative effect of multiple improprieties . . . deprived [him] of his . . . right to a fair trial. . . . To [do so], we must determine whether the sum total of [the prosecutor's] improprieties rendered the defendant's [trial] fundamentally unfair . . . ." (Internal quotation marks omitted.) *State* v. *Weatherspoon*, 332 Conn. 531, 556, 212 A.3d 208 (2019). We review the instances of impropriety in the context of the entire trial and not in a vacuum. See, e.g., *State* v. *Fauci*, 282 Conn. 23, 45, 917 A.2d 978 (2007).

A

Analysis of Alleged Instances of Impropriety

1

Noncompliance with Court Rulings

First, the defendant claims that the prosecutor intentionally violated court rulings during cross-examination when he (1) questioned the defendant about inadmissible financial evidence, (2) referred to a "ticking time bomb," which was a phrase used in an inadmissible note stored on the defendant's phone, and (3) failed to rephrase the question, "[w]ere you trying to create a

State *v.* Dabate

little mini Cheshire[9] scene?'' despite the trial court's order not to include ''that one word . . . .'' Having reviewed these claims in the context of the full record, we conclude that the prosecutor's failure to rephrase the ''Cheshire'' question was improper. Additional relevant facts will be set forth in the context of each claim.

It is well settled that a prosecutor's failure to obey a trial court order concerning the admissibility of evidence, either while examining a witness or during argument, constitutes improper conduct. See, e.g., *State* v. *Ortiz*, 280 Conn. 686, 704, 911 A.2d 1055 (2006); see also *State* v. *Reynolds*, 118 Conn. App. 278, 292, 983 A.2d 874 (2009) (purposeful attempt by prosecutor to include inadmissible evidence ''may entitle the defendant to a new trial'' (internal quotation marks omitted)), cert. denied, 294 Conn. 933, 987 A.2d 1029 (2010); *State* v. *Williams*, 102 Conn. App. 168, 176, 926 A.2d 7 (''evidentiary violations of a court order should be reviewed as prosecutorial [impropriety], not evidentiary errors''), cert. denied, 284 Conn. 906, 931 A.2d 267 (2007). Whether a prosecutor's improper comment or question has affected a defendant's due process rights is case specific and ''turns on the degree to which the breach undermines a trial court's ruling that protects the integrity of the fact-finding process by restricting the admission of unreliable or unduly prejudicial evidence.'' *State* v. *O'Brien-Veader*, supra, 318 Conn. 534. For a breach to constitute prosecutorial impropriety, the trial court's ruling must be unambiguous; an initially ambiguous order may be rendered ''unambiguous following [an] extended colloquy with counsel . . . .'' *State* v. *Martinez*, 319 Conn. 712, 731, 127 A.3d 164 (2015).

[9] The term ''Cheshire,'' as used in this context, refers to a well-known and especially brutal home invasion in Cheshire that resulted in multiple fatalities. See generally *State* v. *Komisarjevsky*, 338 Conn. 526, 258 A.3d 1166, cert. denied, U.S. , 142 S. Ct. 617, 211 L. Ed. 2d 384 (2021); *State* v. *Hayes*, Superior Court, judicial district of New Haven, Docket No. CR-07-0241859 (June 30, 2010).

351 Conn. 428 MARCH, 2025 439

State *v.* Dabate

We acknowledge, however, that "[a] prosecutor's advocacy . . . may occasionally drive him or her close to the line drawn by a trial court order regarding the use of certain evidence." *State* v. *O'Brien-Veader*, supra, 318 Conn. 533. As such, a prosecutor can mitigate an inadvertent reference to inadmissible evidence by an attempt to correct that mistake. See, e.g., *State* v. *Enrique F.*, 146 Conn. App. 820, 831, 79 A.3d 140 (2013), cert. denied, 311 Conn. 903, 83 A.3d 350 (2014).

The defendant first claims that the prosecutor violated the trial court's order precluding discussion of the defendant's financial irregularities by questioning him about the finances of the victim's estate in the presence of the jury. The trial court had, in ruling on the admissibility of the uncharged misconduct evidence, precluded the state from introducing evidence concerning an alleged embezzlement from the defendant's employer, a loan the defendant took out shortly after Ganzer became pregnant, and the depletion of estate assets that occurred when the defendant named himself as a beneficiary of the victim's life insurance policy. During cross-examination, after the defendant testified that the victim did not make much more money than he did, the prosecutor stated: "I mean . . . you've seen the financial analysis in this case." The prosecutor then withdrew the question after defense counsel objected.[10]

---

[10] The defendant also claims that the prosecutor disregarded the trial court's ruling when the prosecutor asked Ganzer: "How about after the murder, did [the defendant] give you any money?" Although the defendant had objected to the state's introduction of evidence regarding the defendant's finances or financial transactions after the victim's death, there had been no ruling on the objection when the prosecutor had questioned Ganzer. The defendant contends that, because there was an objection pending and because the prosecutor should have asked the court to excuse the jury prior to asking the question, it was improper. We disagree. Although the prosecutor asked the question in the presence of the jury, the trial court allowed the prosecutor to ask the question after overruling defense counsel's relevancy objection. As such, we conclude that the prosecutor's question to Ganzer did not violate a court order.

State *v.* Dabate

Read in context, we agree with the state that the prosecutor was referencing only the portion of the financial analysis showing that the victim made more money than the defendant prior to her death, which had not been excluded from evidence. Although the trial court precluded questions on certain specific financial topics, it did not entirely prohibit the state from asking questions regarding the defendant's finances. Accordingly, we conclude that the prosecutor's questions about the victim's income relative to that of the defendant did not constitute prosecutorial impropriety.

We next turn to the defendant's claim that the prosecutor violated a trial court order when he asked the defendant on cross-examination if he was a "ticking time bomb . . . ." The trial court had precluded the admission of a note recovered from the defendant's cell phone in which he had described himself as a "ticking time bomb." The trial court determined that the note was just "random thoughts" and not relevant. The next day, during cross-examination, the prosecutor asked the defendant: "You were a ticking time bomb . . . were you not?" Defense counsel objected to this question, and the trial court sustained the objection. The prosecutor then rephrased the question. The state claims that the prosecutor's use of the phrase "ticking time bomb" does not constitute prosecutorial impropriety because the trial court's order did not bar the use of that phrase, and the prosecutor's question did not reveal the existence of the inadmissible note to the jury. We agree.

Viewed in context, the prosecutor's question did not suggest that the phrase "ticking time bomb" was derived from otherwise inadmissible evidence. There were no specific references to the note itself and no reasonable probability that this phrase tainted the jury's verdict. See, e.g., *Chambliss* v. *Harrington*, Docket No. CV 09-6804-DOC (OP), 2011 WL 5554023, *8 (C.D. Cal. July

State *v.* Dabate

22, 2011) (there was no impropriety when prosecutor did not directly reference precluded evidence); cf. *State* v. *O'Brien-Veader*, supra, 318 Conn. 537–38 (there was impropriety when prosecutor stated, "[a]nd now, the records aren't allowed to come in," because comment conveyed existence of inadmissible evidence to jury (emphasis omitted; internal quotation marks omitted)); *State* v. *Maguire*, 310 Conn. 535, 559, 78 A.3d 828 (2013) (there was impropriety when prosecutor stated, "[defense-counsel is] asking [the witness] about the full interview, and that's not in evidence," because that comment indicated that redacted portions of interview transcript refuted defense counsel's assertion). The phrase "ticking time bomb" is not unique or unusual, and nothing in the question before the jury indicated that its basis was a note on the defendant's phone or any other inadmissible evidence.[11]

The defendant also claims that the prosecutor committed an impropriety by failing to rephrase a question after express direction from the trial court to do so. During cross-examination, the prosecutor asked the defendant: "You made a little fire. Were you trying to create *a little mini Cheshire scene*? Is that what you were trying to do?" (Emphasis added.) Defense counsel objected, and the trial court directed the prosecutor to rephrase the question not to include "that *one* word . . . ." (Emphasis added) The prosecutor then asked: "Were you trying to create a little mini Cheshire scene?" Defense counsel objected again, and the trial court clarified that "references to other criminal scenes are not allowed. Other than that, rephrase the question, and you can ask it." We agree with the defendant that the

---

[11] We recognize, however, that, had the objection not been sustained, and had the defendant provided an inconsistent answer, the prosecutor might have attempted to use the inadmissible note to impeach the defendant. We caution against a tactic of using a specific phrase in an inadmissible document to open the door to impeachment.

State *v.* Dabate

failure to properly rephrase this question violated the court's order.

The state characterizes the prosecutor's conduct as a minor transgression, urging us to accept that the prosecutor, in the heat of cross-examination, simply misapprehended which word the trial court had deemed objectionable. The state's reliance on *State* v. *O'Brien-Veader*, supra, 318 Conn. 534, for the proposition that "[t]he mere failure to correctly rephrase a question in the heat of cross-examination does not constitute the kind of disregard of a court order rising to the level of impropriety" is, however, misplaced. In *O'Brien-Veader*, this court considered whether the prosecutor's questions during cross-examination ran afoul of the trial court's order that hypothetical questions on direct examination must be based on facts in evidence, with greater latitude permitted on cross-examination. Id., 539. We observed that the order was "initially hazy"; id., 541; and "implicitly invited the use of extra-record facts in hypotheticals," rendering the "prosecutor's questions about . . . trivial matters" not impropriety, even if they may have violated the initial order. Id., 540–41.

The present case, however, does not involve the same kind of ambiguity because the trial court's order with respect to the word "Cheshire" was not at all hazy. The state's claim that the prosecutor could not have known which word the trial court had deemed objectionable strains credulity, as does the state's defense of the question on appeal as not apt to inflame the jurors' passions. There can be no legitimate doubt that the word "Cheshire" was the offending word in the trial court's ruling, given the singular meaning of that term in the parlance of Connecticut's criminal justice system and the infamy of the crimes that occurred in Cheshire. It is notable that the prosecutor, the state's attorney for the judicial district of Tolland, despite now claiming that the trial

State *v.* Dabate

court's instruction was unclear, failed to seek clarification and, instead, repeated the question verbatim. As such, the prosecutor's reference to "Cheshire" violated the trial court's order, and we conclude that the prosecutor's failure to correctly rephrase the question constituted impropriety.

In referring to a "mini Cheshire," the prosecutor's question was unnecessarily inflammatory because it compared the defendant to other notorious offenders or infamous figures. See, e.g., *Shurn* v. *Delo*, 177 F.3d 662, 667 (8th Cir.) (it was improper to link defendant with Charles Manson), cert. denied, 528 U.S. 1010, 120 S. Ct. 510, 145 L. Ed. 2d 395 (1999); *United States* v. *Steinkoetter*, 633 F.2d 719, 720 (6th Cir. 1980) (it was improper to compare defendant to Pontius Pilate and Judas Iscariat because that rhetoric had "strong prejudicial overtones"); *United States* v. *Hawkins*, 480 F.2d 1151, 1154 (D.C. Cir. 1973) (it was improper to compare defendant's assertion of insanity defense to infamous cases in which juries rejected that defense); *United States* v. *Phillips*, 476 F.2d 538, 538–39 (D.C. Cir. 1973) (there was improper analogy drawn between defendant's charges and those involving Sirhan Sirhan, James Earl Ray, Richard Speck, and Jack Ruby).

The state argues that the question was not improper because it neither compared the defendant to the perpetrators of the Cheshire murders nor suggested that the crime was similar to those murders, and because it was reasonable to inquire whether the defendant was attempting to recreate the Cheshire crime scene given the evidence at trial. We disagree. First, the prosecutor's question directly asked the defendant if he was attempting to recreate the Cheshire crime scene, which, at the very least, inferentially connected the defendant's actions to those of the Cheshire defendants. Second, there is nothing reasonable about the inquiry based on the evidence, and, therefore, the second offered ground does

State *v.* Dabate

not mitigate the inflammatory nature of the question itself, particularly given the notoriety the term "Cheshire" holds in Connecticut. Accordingly, we conclude that the prosecutor's reference to a "mini Cheshire" was in direct violation of the trial court's ruling and, therefore, was improper.

2

*Singh* Violations

We next turn to the defendant's claim that the prosecutor improperly asked him to comment on other witnesses' testimony on several occasions in violation of *State* v. *Singh*, supra, 259 Conn. 693. The defendant relies on four specific instances when the prosecutor asked him to comment on (1) police testimony, (2) parts of his hospital interview, (3) the time data on the victim's phone compared to other exhibits, and (4) other electronic exhibits.[12] In response, the state contends that the prosecutor did not ask the defendant to characterize another witness' testimony as wrong, mistaken, or a lie, which would violate *Singh*. The state argues that, instead, the prosecutor was simply impeaching the defendant's testimony with inconsistencies based on other evidence in the case. We agree with the state.

In *Singh*, this court held that it was improper for the prosecutor to ask a witness to "characterize another witness' testimony as a lie, mistaken or wrong," and then to argue during summation that the jury could find the defendant not guilty only if it found that the other witnesses had lied. *State* v. *Singh*, supra, 259 Conn. 712. Our holding was based on two reasons: (1) matters

---

[12] The defendant also raises five additional *Singh* violations, none of which was objected to at trial. The defendant has failed to identify the specific questions he deems improper and has not supported these additional allegations with relevant citations to the record and to legal authority. We decline to address these five alleged violations because they are inadequately briefed and, therefore, abandoned. See, e.g., *Estate of Rock* v. *University of Connecticut*, 323 Conn. 26, 33, 144 A.3d 420 (2016).

State *v.* Dabate

of credibility are the province of the jury, and (2) juries should not be told that they must find that a witness had lied in order to find a defendant not guilty, as it distorts a prosecutor's burden of proof. See id., 707–10.

In determining whether a *Singh* violation has occurred, we view the prosecutor's questions and comments in their totality, even if "no single comment in isolation may have violated the rule articulated in *Singh* . . . ." *State* v. *Albino*, 312 Conn. 763, 787, 97 A.3d 478 (2014); see id., 788 (prosecutor violated *Singh* by "stacking the testimony of every single state witness . . . against that of the defendant" such that jury could have deduced that, to find defendant not guilty, it must conclude that every other witness had lied).

We now turn to the defendant's four allegations of *Singh* violations. First, during his cross-examination of the defendant, the prosecutor posited: "And you know three different [police] canine handlers gave testimony [that] there was no exit trail out of that house. . . . And you know, because you heard the testimony that Trooper [Ryan] Cloukey and [his canine] went from the bulkhead, followed the scent trail to the wallet and to you two different times." Defense counsel objected, and the trial court sustained the objection.

Second, the prosecutor played portions of an audio recording of the defendant's hospital interview to impeach his trial testimony with a prior inconsistent statement. At one point, it played for a longer period of time than the trial court had expected, prompting the court to state: "Counsel, you got a question, you ask it. You're not going to replay the entire exhibit. . . . You went way beyond from what I got from your last question." The prosecutor was then allowed to continue his questioning.

Third, the prosecutor showed the defendant photos of the GPS coordinates and time logs from the victim's

State *v.* Dabate

phone and asked the defendant: "What's the time on that time stamp? . . . And, then, if we go to the end when she leaves the [gym], what's that time stamp . . . ?" The procecutor then asked the defendant: "The GPS location of her phone matches with the [gym] photos, doesn't it?" Defense counsel objected to the prosecutor's question, claiming that he was "asking [the defendant] to comment on other people's exhibits." The trial court sustained the objection.

Fourth, the prosecutor asked the defendant: "And you also know that the last movement upstairs by the alarm . . . by the motion detector was at 9:34, between 9:34 and 9:36." Defense counsel objected, and the trial court sustained the objection, stating: "[C]ounsel seems to be referring to other witnesses' testimony and exhibits . . . . I'll sustain the objection as to that because a witness cannot be asked to characterize another witness' testimony. Rephrase."

We conclude that the prosecutor did not pose questions to the defendant that constituted *Singh* violations. The prosecutor did not ask the defendant to characterize another witness as lying or wrong, or imply to the jury that it must find that the witness lied to find the defendant not guilty. To the extent that the prosecutor's questions were phrased objectionably and inartfully, it is well established that not every objectionable question rises to the level of prosecutorial impropriety. See, e.g., *State* v. *Pjura*, 200 Conn. App. 802, 816, 240 A.3d 772, cert. denied, 335 Conn. 977, 241 A.3d 131 (2020). Rather, "[o]ur rules of practice provide a means to prevent improper questions from being answered" because "[i]t would be a rare trial . . . if counsel for one side or the other did not pose an objectionable question . . . ." (Internal quotation marks omitted.) Id. Thus, it is notable that the defendant did not answer any of the objected to questions. Under these circumstances, we conclude that no *Singh* violations occurred because

351 Conn. 428 MARCH, 2025 447

State *v.* Dabate

the prosecutor's questions were unlikely to confuse the issues for the jury and did not shift the prosecutor's burden of proof.

We also disagree with the defendant's reliance on *State* v. *Albino*, supra, 312 Conn. 763, to support his argument that, although no single instance violated the *Singh* rule, the combined instances constituted impropriety when viewed in their totality. *Albino* is distinguishable from the present case because the prosecutor's comments in that case made a direct connection between the defendant's acquittal and the credibility of every other witness. See id., 788. Hence, when the prosecutor in *Albino* argued that the defendant had characterized other witnesses' testimony as a lie, the jury undoubtedly could have inferred that the prosecutor was arguing that, to find the defendant not guilty, it would have to conclude that every other witness had lied. See id. In contrast, the prosecutor in the present case did not connect the prospect of the defendant's acquittal with the credibility of other witnesses. Instead, the prosecutor asked the defendant to listen to or look at evidence that contradicted his testimony and statements. The prosecutor also did not argue that the defendant was characterizing another witness as a liar, which is impermissible under *Singh.* A prosecutor's asking an objectionable question does not always rise to the level of an impropriety, particularly when the defendant ultimately did not answer the question. Accordingly, we conclude that none of the challenged questions was a *Singh* violation.

3

Improper Use of Uncharged Misconduct Evidence

Next, the defendant claims that he did not receive notice of uncharged misconduct introduced by the prosecutor during his cross-examination of the defendant relating to the defendant's removal of his children from

State *v.* Dabate

therapy and the fact that the victim's family was raising his children, arguments between the defendant and the victim concerning the defendant's drinking habits in the months before the murder, and whether the defendant planned to kill the victim while on a trip to Vermont days before the murder. During trial, defense counsel objected to the prosecutor's questions regarding the uncharged misconduct, and the trial court sustained all of those objections, except for a brief reference to the defendant's drinking habits. We conclude that the question regarding the Vermont trip was improper.

During cross-examination, an attorney may ask questions, including those concerning uncharged misconduct, to impeach a witness if there is a good faith belief as to their factual predicate. See Conn. Code Evid. § 6-6 (b) (1); *State* v. *Barnes*, 232 Conn. 740, 747, 657 A.2d 611 (1995). Such questions may exceed the scope of direct examination and refer to facts not in evidence if they relate to the credibility of a criminal defendant's direct testimony. See, e.g., *State* v. *Diaz*, 348 Conn. 750, 775–76, 311 A.3d 714 (2024);. However, "extrinsic evidence of such acts is generally inadmissible." *State* v. *Annulli*, 309 Conn. 482, 492, 71 A.3d 530 (2013); see Conn. Code Evid. § 6-6 (b) (2); cf. *Hicks* v. *State*, 287 Conn. 421, 451, 948 A.2d 982 (2008) (describing when prior acts of misconduct can be proven by extrinsic evidence).

The prosecutor's questions regarding the children and the arguments between the defendant and the victim concerning the defendant's drinking habits were proper subjects of cross-examination. Although the defendant contends that the prosecutor was improperly introducing character evidence[13] regarding his drinking

_____

[13] Under § 4-5 of the Connecticut Code of Evidence, "[e]vidence of other crimes, wrongs or acts of a person is inadmissible to prove the bad character, propensity, or criminal tendencies of that person," with limited exceptions not relevant to this case. Conn. Code Evid. § 4-5 (a).

State *v.* Dabate

habits, his withdrawing the children from therapy, and the fact that the children were no longer in his care, the defendant had previously testified at length during direct examination regarding his relationship with his family and the well-being of his children. See *State* v. *Diaz*, supra, 348 Conn. 775–76. These inquiries by the prosecutor, therefore, had a good faith basis in the evidence and served to impeach the defendant's testimony. They did not prove the bad character, propensity, or criminal tendencies of the defendant. As such, they did not constitute prosecutorial impropriety.

With respect to the prosecutor's cross-examination of the defendant regarding his intentions during the Vermont trip, we agree with the defendant that the prosecutor did not establish "a proper foundation for the [question] by stating a 'good faith belief' that there [was] an adequate factual basis for his inquiry." *State* v. *Barnes*, supra, 232 Conn. 747. We disagree with the state's argument that the prosecutor's good faith belief was grounded in evidence that had been precluded by the trial court. The state argues that the defendant had been conducting Internet searches about methods of poisoning someone before the Vermont trip and that these searches provided a good faith basis for this inquiry. Those Internet searches, however, lack a temporal connection to the Vermont trip because they were performed multiple months prior to the murder, and there was no other evidence to suggest that the defendant had planned to kill the victim on that trip. See *State* v. *Payne*, 260 Conn. 446, 456, 797 A.2d 1088 (2002) (prosecutor committed impropriety when he told jury that "[the defendant] probably got himself involved in another robbery a couple of days later" because there was lack of evidence for that statement (emphasis omitted; internal quotation marks omitted)). Accordingly, we conclude that the question regarding the defendant's intentions during the Vermont trip was improper.

State *v.* Dabate

4

Improprieties During Summation

The defendant next claims that the prosecutor made improper comments during summation, namely, stating during opening summation that the victim had accused the defendant of stealing money from their family, arguing during rebuttal summation that "truth in our society is under attack," which included references to "lying" by "politicians," and suggesting during rebuttal summation that the defendant wanted a jury that was unintelligent, lazy, and gullible. The defendant argues that each of these statements was improper and intended to inflame the jurors' passions.

The record reveals the following additional relevant facts. During opening summation, the prosecutor argued that the victim had "claimed [the defendant] was stealing money from the family." This statement referred to a note written by the victim indicating that the defendant had been stealing money from her; the trial court had admitted that note into evidence for the limited purpose of proving the victim's state of mind. Defense counsel objected to this argument, and the trial court gave a curative instruction that the jury could consider that evidence only for the limited purpose of establishing the victim's state of mind and not for the truth of the matter asserted.

The defendant also claims that the prosecutor made two improper comments during rebuttal summation. First, the prosecutor argued that "truth in our society is under attack" and referenced individuals such as "politicians" who are "lying more often than they used to." Second, the prosecutor told the jurors: "You were picked for this jury by the state because of your intelligence and your life experience. *The defendant is counting on you not to be intelligent here, to not think this through.* The state is counting on you to be diligent in

State *v.* Dabate

putting this puzzle together. *The defendant is counting on you to be lazy or, I guess, just not care. . . .* The state is counting on you to use your common sense. *The defendant wants you to speculate and guess and be gullible and leave your common sense outside the courtroom.*" (Emphasis added.) Defense counsel objected, and the trial court instructed the jury that the arguments of counsel do not constitute evidence.

"[T]he prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case. [The prosecutor] is not only an officer of the court, like every attorney, but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent. . . . By reason of his office, he usually exercises great influence [on] jurors. . . . [Although] the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment [on], or to suggest an inference from, facts not in evidence, or to present matters [that] the jury ha[s] no right to consider." (Internal quotation marks omitted.) *State* v. *Ciullo*, 314 Conn. 28, 37–38, 100 A.3d 779 (2014). "When making closing arguments to the jury, [however] [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument." (Internal quotation marks omitted.) *State* v. *Rowe*, 279 Conn. 139, 158, 900 A.2d 1276 (2006).

Turning to the specific comments, we first agree with the state's contention that the prosecutor's comment that the victim claimed the defendant was stealing money from their family was proper because the purpose for which it was made was consistent with the trial court's limited ruling. As the trial court emphasized

State *v.* Dabate

to the jury immediately after rebuttal and even before the instructions to the jury on the law: "[T]here was an exhibit that was offered for a very limited purpose . . . . It should not be considered as substantive evidence if that's what he did. It's simply being offered to show the state of mind of the [victim] in this case." As to the prosecutor's comment concerning the decline of the value of truth in American society, although close to the line, it was not improper. This comment was directly tied to a request that the jury be guided by the evidence that it finds truthful, and the next sentences in the prosecutor's argument were: "[T]he truth still means something in this room. And a trial is a search for the truth."[14]

The prosecutor's comments concerning the intelligence and potential gullibility of the jury are even more troubling. It is not improper for a prosecutor to appeal to jurors' common sense in their assessment of the evidence. See, e.g., *State* v. *Diaz*, supra, 348 Conn. 774 ("the prosecutor's argument did not appeal to the jurors' passions or emotions but, instead, asked [them] to use their common sense and experience to infer that an innocent man accused of the crimes charged would have exhibited some outrage or anger on the witness stand"); *State* v. *Courtney G.*, 339 Conn. 328, 348, 260 A.3d 1152 (2021) (prosecutor properly "asked the jurors to assess the defendant's credibility in light of his demeanor on the witness stand and implicitly urged [them] to infer, on the basis of their common sense and experience, that an innocent man falsely accused of sexually assaulting a child would have exhibited out-

---

[14] Although we conclude that this comment does not reach the level of impropriety, we nevertheless find it extraneous and unnecessarily close to impropriety. Prosecutors would be well advised to avoid any discussion of either politics or religion before the jury. See, e.g., *State* v. *Ceballos*, 266 Conn. 364, 382–83, 392–93, 832 A.2d 14 (2003) (impropriety when prosecutor made religiously charged statement during summation), overruled in part on other grounds by *State* v. *Douglas C.*, 345 Conn. 421, 285 A.3d 1067 (2022).

State *v.* Dabate

rage while testifying"). Courts are divided, however, with respect to the propriety of comments suggesting that the jury would have to be gullible or unintelligent to accept the defendant's theory of the case. Compare *United States* v. *Drummond*, 481 F.2d 62, 64 (2d Cir. 1973) (it was improper for prosecutor to describe defendant's testimony as "so riddled with lies it insults the intelligence of [the] intelligent people sitting on the jury" (internal quotation marks omitted)), and *People* v. *Sanchez*, 228 Cal. App. 4th 1517, 1529–30, 1532, 176 Cal. Rptr. 3d 517 (2014) (prosecutor's comment during rebuttal argument that defendant was hoping that at least one juror would be " 'gullible enough' " and " 'naive enough' " to accept his arguments and to let him "go home and have a good laugh at your expense" constituted prosecutorial impropriety because it was designed to intimidate and was unsupported by any facts in evidence), with *Carr* v. *State*, 385 So. 3d 1300, 1305–1306 (Miss. App. 2024) (it was not improper for prosecutor to tell jury, " 'you're smarter than that, so don't get caught up, don't be running down rabbit holes where they're going to try to send you' "). See also, e.g., *State* v. *Singh*, supra, 259 Conn. 721–22 (prosecutor improperly inflamed jurors' passions by stating, "then you're not the jurors I thought I selected when I started all of this" (internal quotation marks omitted)).

Having reviewed the record, we conclude that it was improper for the prosecutor to state that the defendant was counting on the jury to be gullible, lazy, and unintelligent.[15] We disagree with the state's argument that its

[15] We agree with the state that the prosecutor properly appealed to the common sense of the jurors in asking them to consider the inconsistencies in the defendant's testimony, which were highlighted through the detectives' testimony and through the electronic evidence, such as the Fitbit data. See, e.g., *State* v. *Pedro S.*, 87 Conn. App. 183, 198, 865 A.2d 1177 (asking jury to "[w]eigh everything [it] heard and [to] use [its] common sense" and stating that it was "in the state's best interest for [the jurors] to use that common sense" were arguments properly based on contradictions in defendant's testimony, rather than on prosecutor's opinion (internal quotation marks omitted)), cert. denied, 273 Conn. 924, 871 A.2d 1033 (2005).

State *v.* Dabate

theory that the defendant had fabricated the home invasion constituted an invitation to comment about the defendant's alleged perception of the jury. Although it is proper for the prosecutor to remind the jury that it has a duty to base its verdict on the evidence, it is improper to insinuate that the jury is unintelligent or lazy if it agrees with the defendant's theory of the case. Such comments improperly inflame jurors' passions and "have the effect of diverting the jury's attention from [its] duty to decide the case on the evidence." (Internal quotation marks omitted.) *State* v. *Pouncey*, 241 Conn. 802, 811, 699 A.2d 901 (1997). The inflammatory aspect of these comments was compounded by the fact that the prosecutor made them during rebuttal summation, which meant that the defense could not respond. We, therefore, conclude that the prosecutor improperly conveyed the message that the defendant wanted the jury to act in a manner inconsistent with its oath by acting unintelligently and lazily, and that a verdict in the defendant's favor would demonstrate that the jury had violated its oath to rely solely on the evidence before it.[16]

---

[16] The defendant additionally argues that the prosecutor was impugning the role of defense counsel by implying that defense counsel was attempting to deceive the jury. We disagree. "[T]he prosecutor is expected to refrain from impugning, directly or through implication, the integrity or institutional role of defense counsel. . . . There is a distinction [however] between argument that disparages the integrity or role of defense counsel and argument that disparages a theory of defense. . . . Moreover, not every use of rhetorical language is improper. . . . There is ample room, in the heat of argument, for the prosecutor to challenge vigorously the arguments made by defense counsel." (Internal quotation marks omitted.) *State* v. *James*, 141 Conn. App. 124, 149, 60 A.3d 1011, cert. denied, 308 Conn. 932, 64 A.3d 331 (2013). The prosecutor did not refer to defense counsel, imply that his strategy was to deceive the jury, or "directly or by implication [denigrate] the integrity or institutional role of defense counsel." (Internal quotation marks omitted.) *State* v. *Swain*, 101 Conn. App. 253, 274, 921 A.2d 712, cert. denied, 283 Conn. 909, 928 A.2d 539 (2007). Therefore, we conclude that the prosecutor was not impugning defense counsel or the role of defense counsel in the process.

State *v.* Dabate

5

### Comment on the Defendant's Exercise of His Right to Counsel

The defendant also claims that the prosecutor improperly commented on the defendant's exercise of his fifth amendment right to counsel in questioning him about a newspaper article that was published the day after the crime. Relying on *State* v. *Angel T.*, 292 Conn. 262, 973 A.2d 1207 (2009), the defendant argues that the prosecutor's suggestion that he had a duty, in response to a newspaper article about the crime, to explain to the police why he should not be a suspect was prosecutorial impropriety because it violated his right to counsel. The state contends that *Angel T.* is distinguishable and that the prosecutor validly impeached the defendant with his prearrest and pre-*Miranda* silence, rather than commenting on the fact that the defendant had retained counsel. We agree with the state.

The record reveals the following additional relevant facts. A local newspaper published an article about the crime on December 24, 2015, the day after the murder. See D. Moran, "Wife Dead, Husband Injured After Incident on Birchview Drive in Ellington," Hartford Courant, December 24, 2015. The newspaper article included a statement from a local police official that there was no ongoing threat to public safety in the wake of the apparent home invasion. Id. After reading this article, the defendant inferred that he was the only suspect in the case. At trial, the defendant introduced the article into evidence to explain why, in the days after the murder, he had discussed the case with various persons but withheld some information from others. During cross-examination, the prosecutor asked the defendant if, after reading the article and thinking it was "inaccurate," he "called those two very gentle state police detectives to say what's going on?" The trial court sustained defense

State *v.* Dabate

counsel's objection to this question, finding that it was improper because the prosecutor was "well aware that [the defendant] had the advice of counsel at that point in time" after the hospital interview during which he had invoked his right to counsel.

In *Doyle* v. *Ohio*, 426 U.S. 610, 619, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), "the United States Supreme Court held that the impeachment of a defendant through evidence of his silence following his arrest and receipt of *Miranda* warnings violates due process." *State* v. *Patrick M.*, 344 Conn. 565, 582, 280 A.3d 461 (2022). "Use of a defendant's pre-*Miranda* silence, by contrast, does not raise the same constitutional concerns: evidence of prearrest, and specifically pre-*Miranda*, silence is admissible to impeach the testimony of a defendant who testifies at trial, since the rule of *Doyle* . . . is predicated on the defendant's reliance on the implicit promise of *Miranda* warnings." (Citation omitted; internal quotation marks omitted.) Id., 583; see *State* v. *Angel T.*, supra, 292 Conn. 286 n.19.

The invocation of the right to counsel is, however, distinct from pre-*Miranda* silence. In *Angel T.*, this court held that the prosecutor improperly encouraged the jury to infer the defendant's guilt from evidence that the defendant, who had been represented by counsel before the initiation of custodial interrogation or adversarial criminal proceedings, did not help with the police investigation of the sexual abuse of his niece. *State* v. *Angel T.*, supra, 292 Conn. 264. While cross-examining the defendant, the prosecutor elicited testimony that the defendant had retained counsel and, then, discussed that testimony during summation. Id., 290. The prosecutor made multiple references to the fact that the detectives could not reach the defendant to interview him and, during summation, pointed out that the defendant had not taken advantage of an opportunity to help with the investigation. See id., 266–71. This court held that

State *v.* Dabate

the prosecutor had violated the defendant's due process rights by penalizing him for asserting his right against self-incrimination. Id., 274, 286. We clarified that our conclusion was "based *solely* on the prejudicial effect of the admission of, and argument about, the evidence that the defendant apparently had retained counsel in connection with the police investigation of the victim's allegations . . . because evidence of prearrest, and specifically pre-*Miranda*, silence is admissible to impeach the testimony of a defendant who testifies at trial . . . ." (Emphasis added.) Id., 286 n.19; see *State* v. *Coccomo*, 302 Conn. 664, 674–75, 31 A.3d 1012 (2011) (*Angel T.* stands for proposition that "the admission of ambiguous evidence of consciousness of guilt was improper").

In contrast to *Angel T.*, the question at issue in the present case was the proper impeachment of the defendant with evidence of his prearrest and pre-*Miranda* silence. See *State* v. *Patrick M.*, supra, 344 Conn. 589. At the time of the defendant's proposed silence, he was not yet under arrest and had not received *Miranda* warnings. The prosecutor in the present case did not argue—expressly or implicitly—that the defendant's retention of counsel demonstrated consciousness of guilt. We disagree with the defendant's argument that the prosecutor's question was improper because it *would have* elicited testimony that the defendant did not contact the police because he had been advised by his attorney not to do so, as there is no indication in the record that this information was disclosed to the jury or that the prosecutor impliedly or explicitly referenced this fact.[17] Instead, because the defendant had not yet received *Miranda* warnings or arrested when he read the newspaper article, his choice to testify at trial as a putative victim of the crime rendered his pre-*Miranda*

---

[17] The defendant did not testify on this point because the trial court sustained defense counsel's immediate objection to the prosecutor's question.

State *v.* Dabate

silence admissible for impeachment purposes. See, e.g., *State* v. *Santiago*, 100 Conn. App. 236, 247, 917 A.2d 1051 ("the prosecutor . . . did not improperly appeal to the jury to infer guilt from the defendant's having contacted an attorney and having received the counsel of an attorney"), cert. denied, 284 Conn. 933, 935 A.2d 152 (2007), and cert. denied, 284 Conn. 933, 935 A.2d 153 (2007). Indeed, a question that may elicit a response from a defendant that he or she had relied on the advice of counsel is not per se improper. Rather, it is improper for a prosecutor to rely on that answer in support of an inference that the defendant engaged counsel only because he is guilty. Accordingly, we conclude that the prosecutor's question about the defendant's failure to contact the police after the publication of the newspaper article was not prosecutorial impropriety.

6

Violation of Disclosure Requirements

Finally, the defendant claims that the prosecutor violated *Brady* v. *Maryland*, supra, 373 U.S. 87, and our rules of practice by failing to disclose the anticipated testimony of Charles Johndro, an emergency medicine physician, as an expert witness.[18] We conclude that the prosecutor's failure to disclose Johndro's anticipated testimony was not a *Brady* violation, but the nondisclosure did violate the prosecutor's obligations under the rules of practice.

The record reveals the following additional relevant facts. Johndro, who had been disclosed as a potential expert witness, testified about his treatment of the defendant in the hospital emergency department on the

---

[18] The defendant also claims that the state breached its disclosure obligations with respect to Payette, one of the investigating state police detectives. Because the defendant concedes that he was not harmed by this failure to disclose, we need not analyze the prosecutor's conduct with respect to Payette for purposes of a prosecutorial impropriety claim.

State *v.* Dabate

day of the murder, including his clinical impression that the defendant's injuries were consistent with self-inflicted wounds. The opinion that the defendant's wounds were self-inflicted was not in the hospital records that were disclosed. Although Johndro had reported his opinion to the prosecutor months prior to the trial, the prosecutor did not disclose that opinion to the defense and never asked Johndro to put this opinion in writing; hence, the defense did not know of this opinion until Johndro testified. Defense counsel moved to strike Johndro's testimony, claiming that the failure to disclose Johndro's opinion constituted a *Brady* violation. The trial court granted the motion to strike the testimony after finding a *Brady* violation and instructed the jury not to consider that portion of Johndro's testimony.

It is axiomatic that the three essential components of a *Brady* claim are (1) "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching,"[19] (2) "that evidence must have been suppressed by the [s]tate, either [wilfully] or inadvertently," and (3) "prejudice must have ensued." (Internal quotation marks omitted.) *State* v. *Ortiz*, supra, 280 Conn. 717. *Brady*'s requirement of disclosure rests with the prosecutor because of "the special role played by the American prosecutor in the search for truth in criminal trials." *Strickler* v. *Greene*, 527 U.S. 263, 281, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999). We agree with the state that the prosecutor's failure to disclose Johndro's testimony that the defendant's injuries appeared to be self-inflicted was not a *Brady* violation because it was not favorable to the defendant and, thus, not exculpatory in nature. We note, however, that tactics such as the one engaged in by the

_____

[19] "The purpose of requiring the state to disclose impeachment evidence to a criminal defendant is to ensure that the jury knows the facts that might motivate a witness in giving testimony . . . ." (Internal quotation marks omitted.) *State* v. *Floyd*, 253 Conn. 700, 744, 756 A.2d 799 (2000).

State *v.* Dabate

prosecutor in the present case are inconsistent with a prosecutor's obligation to seek justice consistent with the law and the evidence. Indeed, the central purpose of a criminal trial is "to ascertain the truth which is the sine qua non of a fair trial." *Estes* v. *Texas*, 381 U.S. 532, 540, 85 S. Ct. 1628, 14 L. Ed. 2d 543 (1965).

Although the prosecutor's failure to disclose Johndro's opinion that the defendant's wounds appeared to be self-inflicted was not a *Brady* violation, he nevertheless failed to comply with his obligations under Practice Book § 40-11 (a), which provides in relevant part: "Upon written request by a defendant filed in accordance with Section 41-5 and without requiring any order of the judicial authority, the prosecuting authority . . . shall promptly, *but no later than forty-five days* from the filing of the request . . . disclose in writing the existence of, provide photocopies of, and allow the defendant in accordance with Section 40-7, to inspect, copy, photograph and have reasonable tests made on any of the following items:

\* \* \*

"(3) *Any reports or statements of experts made in connection with the offense charged including results of physical and mental examinations and of scientific tests, experiments or comparisons which are material to the preparation of the defense or are intended for use by the prosecuting authority as evidence in chief at the trial* . . . ." (Emphasis added.)

We have explained that "[t]he purpose of criminal discovery is to prevent surprise and to afford the parties a reasonable opportunity to prepare for trial." *State* v. *Festo*, 181 Conn. 254, 265, 435 A.2d 38 (1980). When required, the state must comply with disclosure requirements to ensure that the defendant has an adequate opportunity to prepare a defense. See *State* v. *Jackson*, 334 Conn. 793, 813, 224 A.3d 886 (2020) (explaining

State *v.* Dabate

that state's failure to timely disclose expert witness "rendered the defendant's opportunity to prepare a meaningful defense effectively nonexistent"). Indeed, "[c]riminal discovery is not a game. It is integral to the quest for truth and the fair adjudication of guilt or innocence." *Taylor* v. *Illinois*, 484 U.S. 400, 419, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988) (Brennan, J., dissenting).

The record indicates that the state was aware of Johndro's anticipated testimony for months prior to the trial and failed to disclose it to the defendant, even though it would have been material to the preparation of the defense and was introduced as evidence in the state's case-in-chief.[20] At oral argument before this court, the state attributed this failure to the fact that Johndro's opinion had not been written down. In its brief, the state further contends that it had no duty, under the rules of practice or the Connecticut constitution, "to memorialize Johndro's inculpatory opinion and [to] disclose it to the defendant."[21] Johndro's testimony, however, was consistent with the state's theory of the case that the defendant had staged the home invasion, which,

---

[20] "The history of Practice Book § 40-11 . . . reveals that the phrase 'material to the preparation of the defense' in § 40-11 (a) (1) was intentionally included in order to broaden the scope of our rules of discovery with respect to information that must be furnished by the state to a criminal defendant." *State* v. *Andres C.*, 349 Conn. 300, 351, 315 A.3d 1014, (*McDonald, J.*, concurring), cert. denied,      U.S.    , 145 S. Ct. 602, 220 L. Ed. 2d 236 (2024). Affording a defendant the opportunity to obtain discovery that is "material to the preparation of the defense" is a significant provision of our rules of criminal practice because it "may provide critical evidence that a defendant may not be able to obtain otherwise. This language is critical to effectuating the goal of robust discovery of material information in the possession of the state to ensure that the criminal trial is a search for the truth." Id.

[21] Although Practice Book § 40-11 (a) (3) does not specify that oral statements must be disclosed, the state risks violating the defendant's due process rights by choosing not to write down material information in order to circumvent its discovery obligations. See *State* v. *Hargett*, 343 Conn. 604, 634, 641–42, 275 A.3d 601 (2022) (indicating that late disclosure implicates "fundamental protections of due process" and emphasizing that "the state has a duty to defendants, to the public, and to the courts to act with diligence in the disclosure of evidence").

State *v.* Dabate

accordingly, contradicted the defendant's third-party culpability theory. Because the prosecutor failed to disclose such information, the trial court correctly sanctioned the state and precluded the prosecutor from using that evidence. Cf. *Cavallaro* v. *Hospital of Saint Raphael*, 92 Conn. App. 59, 72, 882 A.2d 1254 (expert testimony was precluded as sanction for party's late disclosure of treating physician as expert witness), cert. denied, 276 Conn. 926, 888 A.2d 93 (2005). We conclude that the prosecutor's failure to disclose Johndro's opinion regarding the nature of the defendant's injuries constituted a disclosure violation under the rules of practice and, as such, constituted an additional instance of prosecutorial impropriety.

B

Analysis of Whether the Prosecutorial Improprieties Deprived the Defendant of His Right to a Fair Trial

We now must consider whether the previously identified prosecutorial improprieties deprived the defendant of a fair trial. These improprieties include (1) violating the trial court's order not to use the word "Cheshire," (2) asking the defendant whether he was planning to kill the victim while on the Vermont trip, (3) stating that the defendant was counting on the jury to be gullible, unintelligent, and lazy, and (4) failing to disclose Johndro's anticipated testimony in accordance with the rules of practice.

"To prove prosecutorial [impropriety], the defendant must demonstrate substantial prejudice. . . . In order to demonstrate this, the defendant must establish that the trial as a whole was fundamentally unfair and that the [impropriety] so infected the trial with unfairness as to make the conviction a denial of due process. . . . In weighing the significance of an instance of prosecutorial impropriety, a reviewing court must consider the

State *v.* Dabate

entire context of the trial, and [t]he question of whether the defendant has been prejudiced by prosecutorial [impropriety] . . . depends on whether there is a reasonable likelihood that the jury's verdict would have been different [in the absence of] the sum total of the improprieties.''[22] (Internal quotation marks omitted.) *State* v. *Hinds*, 344 Conn. 541, 563, 280 A.3d 446 (2022).

It is well established that, in determining whether prosecutorial impropriety deprived the defendant of a fair trial, this court applies the factors set forth in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). ''These factors include [1] the extent to which the [impropriety] was invited by defense conduct or argument, [2] the severity of the [impropriety], [3] the frequency of the [impropriety], [4] the centrality of the [impropriety] to the critical issues in the case, [5] the strength of the curative measures adopted, and [6] the strength of the state's case.'' (Internal quotation marks omitted.) *State* v. *Sinclair*, 332 Conn. 204, 237, 210 A.3d 509 (2022).

As to the first *Williams* factor, we conclude that the prosecutor's improprieties were not invited by the

---

[22] The defendant argues in his brief that this court should apply the harmless error standard to his prosecutorial impropriety claim. We disagree. We analyze a claim of prosecutorial impropriety under the harmless error standard only when it infringes on a specifically enumerated constitutional right, rather than on the more generalized due process right to a fair trial. See, e.g., *State* v. *A. M.*, 324 Conn. 190, 200, 152 A.3d 49 (2016) (''[b]ecause the defendant's claim . . . implicated his fifth amendment right to remain silent, we apply the harmless error standard . . . rather than the general due process standard from [*State* v. *Williams*, 204 Conn. 523, 529 A.2d 653 (1987)]''); see also *State* v. *A. M.*, supra, 199 (''If the defendant raises [a specifically enumerated constitutional right], the defendant initially has the burden to establish that a constitutional right was violated. . . . If the defendant establishes the violation, however, the burden shifts to the state to prove that the violation was harmless beyond a reasonable doubt.'' (Citation omitted.)). Nevertheless, the harmless error analysis is inherent in the question of whether the defendant's right to a fair trial was violated. See *State* v. *Williams*, supra, 550 (''[n]or is this a case in which the state's evidence was so strong that we can say that there was harmless error'').

State *v.* Dabate

defense. With respect to the prosecutor's question related to the Vermont trip, the state argues that the defendant had "opened the door on direct examination" when he testified at length regarding his relationship with the victim and their trip to Vermont prior to the prosecutor's question on cross-examination. We disagree. The defendant did not invite improper conduct simply by discussing his relationship with the victim and their trip to Vermont. See, e.g., *State* v. *Ceballos*, 266 Conn. 364, 409, 832 A.2d 14 (2003) ("we reject the notion that, standing alone, a legitimate defense theory can be viewed as inviting improper conduct on the part of the state's attorney"), overruled in part on other grounds by *State* v. *Douglas C.*, 345 Conn. 421, 285 A.3d 1067 (2022); see also *State* v. *Ceballos*, supra, 409–10 (defense counsel did not invite prosecutor's improper comment by describing defendant as good person who emigrated to the United States for better life). Similarly, the disclosure violation regarding Johndro, the prosecutor's comments regarding Cheshire, and the defendant's relying on the jury to be gullible, lazy, and unintelligent, were also unprompted and were not invited by the defendant or defense counsel.

As to the second *Williams* factor, we conclude that, when viewed in the context of the entire trial, the improprieties were not sufficiently severe or frequent to deprive the defendant of a fair trial. We determined that there were four instances of prosecutorial impropriety. When considered in context of the 130 witnesses and the 600 exhibits presented during the five week trial, the harm was less pronounced insofar as the improprieties occurred infrequently. See, e.g., *State* v. *O'Brien-Veader*, supra, 318 Conn. 550 ("these two improprieties were confined to the cross-examination of [the expert witness] and, therefore, were not frequent"). But cf. *State* v. *Angel T.*, supra, 292 Conn. 289–90 (prosecutor's eliciting improper evidence and discussing that evidence at length

351 Conn. 428 MARCH, 2025 465

State *v.* Dabate

during opening and rebuttal summations was deemed frequent). We note, however, that it is clear from the record that the prosecutor intentionally disregarded court orders and tried to undermine the authority and rulings of the trial court. The prosecutor's disregard of the court's ruling on, for example, the use of the highly inflammatory reference to "Cheshire" was not necessary and created the risk of violating the defendant's due process rights.

The next *Williams* factor requires us to determine the centrality of the improprieties to the critical issues in the case, namely, whether the defendant shot the victim and then staged a home invasion to cover up the murder. Each of the four improprieties related to the theory of the state's case, but none, except for the commentsregarding the gullibility of the jury, was relied on by the prosecutor during summation to support the state's argument.[23] See, e.g., *State* v. *O'Brien-Veader*, supra, 318 Conn. 550 (relying on prosecutor's summation to assess strength of state's case and centrality of improprieties). Although the disclosure violation related to evidence that undercut the defendant's theory that a third party had committed the home invasion, namely, Johndro's testimony that the defendant's wounds appeared to be self-inflicted, the trial court struck that portion of the testimony and instructed the jury not to consider it. The disclosure violation, therefore, neither benefited the state nor harmed the defendant. Thus, although the various improprieties related to the critical issues in this case, their effect was insufficiently severe to deprive the defendant of a fair trial.

Whether the trial court implemented any curative measures is another *Williams* factor. Here, the numer-

---

[23] Although the prosecutor briefly mentioned the Vermont trip during summation, he did not suggest that the defendant intended to kill the victim during the trip. Rather, the prosecutor mentioned the Vermont trip to raise the issue of whether the victim would still have gone on the trip if, consistent with his testimony, he had informed the victim, prior to the trip, about his affair and of the unexpected pregnancy.

State *v.* Dabate

ous curative measures that the trial court implemented when the defense objected to improper questions or comments served to mitigate any adverse effect of these improprieties. When each of the improprieties occurred, the trial court either sustained the defense's objection, specified to the jury how it should consider the evidence, or excused the jury from the courtroom to consider the issue further. These contemporaneous instructions, which we presume the jury followed, served to mitigate any potential harm that the defendant might otherwise have suffered from these improprieties. See, e.g., *State* v. *Courtney G.*, supra, 339 Conn. 364 ("[g]iven the isolated nature of the prosecutor's comment and the trial court's prompt and effective curative instruction, which specifically targeted the prosecutorial impropriety, we conclude that [the] impropriety was not frequent or severe and was cured by the trial court" (footnote omitted)); *State* v. *O'Brien-Veader*, supra, 318 Conn. 550 ("to the extent there was any harm, it was mitigated by the trial court's prompt curative instruction directing the jury to disregard the improper questions, which we presume the jury followed"); cf. *State* v. *Ceballos*, supra, 266 Conn. 413 ("a general [curative] instruction does not have the same curative effect as a charge directed at a specific impropriety, particularly when the [impropriety] has been more than an isolated occurrence"). It is important to observe that, although these curative measures served to mitigate the potential harm from the improprieties, they do not diminish the troubling nature of the improprieties themselves. Indeed, had the trial court not been diligent in ensuring that the prosecutor's comments did not stray beyond permissible bounds, there may well have been additional instances of impropriety.[24]

---

[24] We also note the admirable manner in which the trial court conducted the trial. It immediately and consistently implemented curative actions that protected the defendant's right to a fair trial from a prosecutor whose advocacy was often on the line of impropriety.

State *v.* Dabate

As to the final *Williams* factor, the strength of the state's case, we conclude that the state's case was very strong and not "overshadowed by" the prosecutor's improprieties.[25] (Internal quotation marks omitted.) *State* v. *Courtney G.*, supra, 339 Conn. 366. A substantial array of electronic and physical evidence provided circumstantial support for the state's theory of the case and corroborated the testimony of the state's witnesses. See, e.g., *State* v. *Thompson*, 266 Conn. 440, 482–83, 832 A.2d 626 (2003) (strength of state's case was not diminished by circumstantial nature of evidence). That evidence, including the victim's Facebook activity and the data from her Fitbit, demonstrated to the jury that the victim was alive at the time that the defendant claimed that she had been murdered by a third party. The state also presented evidence that the defendant had been testing his home security system on the day of the murder and that he had never left his home that day, contradicting his testimony that he had driven to work that morning. Further, there was evidence that police canines were unable to detect any scent trails attributable to the presence of another person in the house besides the defendant. Finally, the jury heard the defendant's own contradictory testimony, observed his demeanor on the witness stand, and learned about his motive to kill the victim. As opposed to cases that rest solely on the credibility of the defendant and witnesses, in the present case, the strength of the state's physical evidence, supported by evidence of the defendant's motive to murder the victim, substantially diminished any potentially inflammatory effect the prosecutor's

---

[25] We emphasize that none of the *Williams* factors is determinative on its own. In regard to the final *Williams* factor, the strength of the state's case, we emphasize that a very strong case against a defendant does not always compel a conclusion that the defendant's right to a fair trial was not violated. Despite concluding in this case that the state's case was not overshadowed by the improprieties, we acknowledge that there may be instances in which the gravity of the impropriety can outweigh even the strongest case against the defendant with respect to the fairness of the trial.

State *v.* Dabate

improprieties may otherwise have had on the jury. See, e.g., *State* v. *Hinds*, supra, 344 Conn. 565 n.12 (state's case was strong, despite "discrepancies and gaps" in testimony of five eyewitnesses, when "there was considerable overlap in their testimony and . . . when their accounts were combined with the forensic evidence and the defendant's highly incriminating statements and conduct, it left no doubt as to the defendant's culpability for the victim's murder"); *State* v. *Thompson*, supra, 483 (state's case was strong when "the physical evidence corroborated the incriminating testimony of the state's witnesses, and the defendant's own statements and behavior offered further corroboration of that evidence"). Based on our review of the record, there is not a reasonable likelihood that the jury's verdict would have been different in the absence of the prosecutorial improprieties. Applying each of the *Williams* factors, we conclude that the defendant has not established that the trial as a whole was fundamentally unfair such that he was deprived of a fair trial in violation of his due process rights.

C

Supervisory Authority

The defendant next asks this court to exercise its supervisory authority over the administration of justice to reverse his conviction as a sanction for the prosecutorial improprieties that occurred at trial. He argues that the exercise of our supervisory authority is warranted because the prosecutor intentionally violated numerous instructions by the trial court and these improprieties occurred near the end of the trial. He contends that, because of when they occurred, the improprieties were more harmful and reduced the likelihood that the trial court would have declared a mistrial. Although the four identified prosecutorial improprieties demonstrate that the prosecutor failed to live up to his duty as "a high

State *v.* Dabate

public officer, representing the people of the [s]tate
. . . seek[ing] impartial justice for the guilty as much
as for the innocent''; (internal quotation marks omitted.)
*State* v. *Ciullo*, supra, 314 Conn. 37–38; we are not
persuaded that they warrant reversal of the defendant's
conviction under our supervisory authority.

"It is well settled that [a]ppellate courts possess an
inherent supervisory authority over the administration
of justice." (Internal quotation marks omitted.) *State* v.
*Elson*, 311 Conn. 726, 764, 91 A.3d 862 (2014). We will
exercise our supervisory authority to reverse a convic-
tion "only in the rare case [in which] fairness and justice
demand it. . . . [The issue at hand must be] of [the]
utmost seriousness, not only for the integrity of a partic-
ular trial but also for the perceived fairness of the judi-
cial system as a whole." (Internal quotation marks
omitted.) *State* v. *King*, 350 Conn. 303, 335–36, 324 A.3d
81 (2024); see also id., 335 (describing two broader
categories of cases in which this court exercises its
supervisory authority).

"[W]e exercise our supervisory authority in [the pros-
ecutorial impropriety] context to redress repeated and
deliberate [improper conduct] by a prosecutor seeking
to increase the likelihood of conviction even though
that conduct does not necessarily require reversal as a
due process violation. . . . [W]e pay particular atten-
tion to the fact that the prosecutor knew or should have
known that the conduct was improper and was part of
a pattern of similar [improper conduct] in other cases.
We exercise our supervisory authority in order to pro-
tect the rights of defendants and to maintain standards
among prosecutors throughout the judicial system
rather than to redress the unfairness of a particular
trial." *State* v. *Payne*, supra, 260 Conn. 451–52.

Whether to reverse a conviction under our supervi-
sory authority requires the balancing of various inter-

State *v.* Dabate

ests, namely, "the extent of prejudice to the defendant; the emotional trauma to the victims or others likely to result from reliving their experiences at a new trial;[26] the practical problems of memory loss and unavailability of witnesses after much time has elapsed; and the availability of other sanctions for such [improper conduct]." (Footnote added; internal quotation marks omitted.) *State* v. *Pouncey*, supra, 241 Conn. 813. Additionally, a trial court's ruling on prosecutorial impropriety and whether it has risen to the level of harmful error "is entitled to weight because of the vantage point from which [the trial court] can observe and evaluate the circumstances of the trial." *State* v. *Glenn*, 194 Conn. 483, 493, 481 A.2d 741 (1984). After balancing these interests, we conclude that a new trial is not warranted in the present case.

First, the prosecutorial improprieties in the present case did not significantly prejudice the defendant. The state had a strong case that was well supported by the testimony of various witnesses and experts, and electronic evidence, such as the Fitbit data and the home security system, which contradicted the defendant's testimony that there had been a home invasion. The state's evidence established that the defendant had fabricated the home invasion story and had intentionally killed the victim. The improprieties in the present case

---

[26] We note that this interest largely refers to victims who would be required to testify at a new trial, as opposed to those who may generally be impacted by the reliving of this traumatic experience, such as the victim's family. See *State* v. *Pouncey*, supra, 241 Conn. 815 and n.11 (discussing emotional trauma in regard to victim who would have to testify again).

Nevertheless, this interest, although previously discussed in various cases, should be applied sparingly and is typically not dispositive of the supervisory authority analysis. As we noted in *Payne*: "Any time those affected by a violent crime are forced to relive their experiences in a new trial, the emotional trauma is significant." *State* v. *Payne*, supra, 260 Conn. 464. Therefore, this interest almost always cuts against the defendant in such a broad manner that its usefulness in a supervisory authority analysis is limited. As such, we decline to address it in our analysis in the present case.

State *v.* Dabate

did not serve to strengthen or corroborate the state's evidence such that they "increased the possibility that the defendant was convicted on the basis of either inferences not grounded on facts in evidence or a perceived criminal predisposition." *State* v. *Payne*, supra, 260 Conn. 464. Additionally, the level of prejudice was significantly diminished, as the trial court sustained objections, removed the jury from the courtroom, and gave curative instructions in response to the prosecutor's improper conduct.

Second, the practical problems of memory loss and unavailability of witnesses are not particularly significant in the present case. The victim's murder occurred in 2015, and the case was tried in 2022. There is no indication that the memories of testifying witnesses have been severely impaired since the date of the crime or the date of trial. See, e.g., *State* v. *Santiago*, 143 Conn. App. 26, 28–29, 50, 66 A.3d 520 (2013) (memory loss was not significant factor when murder occurred approximately fifteen years beforehand and trial occurred approximately three years prior to Appellate Court's decision).

Finally, we must consider the other available sanctions for the improper conduct. The prosecutor committed four instances of prosecutorial impropriety and was reprimanded by the trial court on each occasion.[27] Despite these improprieties, our analysis leads us to the conclusion that the extreme remedy of reversal to sanction the state or to deter other prosecutors is unwarranted.

We acknowledge that the prosecutor's conduct did not meet the standard of professionalism expected of

[27] Although this court has previously considered instances of deliberate impropriety by a particular prosecutor across a series of cases when determining whether to exercise our supervisory authority; see *State* v. *O'Brien-Veader*, supra, 318 Conn. 551 n.24; such a pattern of impropriety is not a necessary prerequisite to the exercise of our supervisory authority because it would undermine the cardinal principle "that our supervisory [authority] must be flexible and that [its] application must be determined

State *v.* Dabate

prosecutors in the state and that he was admonished multiple times by the trial court. This is particularly notable because he is an experienced litigator who has successfully prosecuted numerous cases and is the state's attorney for the judicial district of Tolland. See, e.g., *State* v. *Reynolds*, 264 Conn. 1, 215, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004). The state's attorney is the chief law enforcement officer in his or her jurisdiction and is "the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." (Internal quotation marks omitted.) *Stricker* v. *Greene*, supra, 527 U.S. 281. Indeed, in a court of law, state's attorneys are not only *representatives* of the state but are also *the* state and represent the societal interests of its people. Considered constitutional officers, state's attorneys are often referred to as ministers of justice or as occupying a quasi-judicial position. See, e.g., *State* v. *Livingston*, 22 Conn. App. 216, 224, 577 A.2d 734, cert. denied, 216 Conn. 812, 580 A.2d 63 (1990). Given the high office they occupy, this court and the people of Connecticut rightly expect that "[c]ases brought on behalf of the [state] should be conducted with a dignity worthy of the client." (Internal quotation marks omitted.) *State* v. *Couture*, 194 Conn. 530, 567, 482 A.2d 300 (1984) (*Healey, J.*, dissenting), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985).

We disapprove of the improprieties committed by the prosecutor during the trial of this case in strong and unqualified terms and expect our message to be taken with the utmost seriousness by prosecutors. We never-

by the interest of justice." *State* v. *Simmons*, 188 Conn. App. 813, 849 n.16, 205 A.3d 569 (2019).

State *v.* Dabate

theless conclude that these four instances of impropriety do not impact the perceived fairness of the judicial system as a whole and do not warrant the extraordinary remedy of reversal under our supervisory authority over the administration of justice.

II

ADMISSIBILITY OF FITBIT EVIDENCE

The defendant next challenges the admission of data from the victim's Fitbit following a *Porter* hearing. See *State* v. *Porter*, 241 Conn. 57, 80–90, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998). He claims that the Fitbit evidence is unreliable and cannot be accurately measured. He argues that the state's expert witness, Diaz, did not have the requisite expertise or technological background to explain the operation of the Fitbit, rendering this evidence inadmissible under *Porter*. The state counters that the Fitbit evidence was admissible without a *Porter* hearing or, in the alternative, that the trial court properly exercised its discretion in admitting the evidence because Diaz' testimony satisfied the *Porter* factors. We agree that the trial court did not abuse its discretion by admitting the data from the victim's Fitbit.

The following additional facts are relevant to this claim. Before trial, the defendant moved to preclude records from the victim's Fitbit, which had registered the victim's movements on the morning of the murder. During a *Porter* hearing, the state introduced evidence and testimony from Diaz. At the conclusion of the hearing, the trial court denied the defendant's motion to preclude the Fitbit evidence and found that Diaz' testimony "established that the Fitbit device had been tested extensively, the [research] had been subjected to peer review, the device was generally accepted in the scientific research community, the device was accurate, and the device had been developed for extrajudicial pur-

State *v.* Dabate

poses." In addition, the court relied on *Lorraine* v. *Markel American Ins. Co.*, 241 F.R.D. 534, 545 (D. Md. 2007), to conclude that "electronically stored evidence may be authenticated by someone with personal knowledge of authorship or personal knowledge of how that type of exhibit is routinely made." Accordingly, the court allowed the state to introduce expert testimony from Diaz about the operation and accuracy of Fitbit One, the Fitbit model that the victim wore on the day of the murder.

We begin with our standard of review and the relevant legal principles. "It is axiomatic that [t]he trial court's ruling on the admissibility of evidence is entitled to great deference. In this regard, the trial court is vested with wide discretion in determining the admissibility of evidence. . . . Accordingly, [t]he trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion." (Internal quotation marks omitted.) *State* v. *Raynor*, 337 Conn. 527, 540, 254 A.3d 874 (2020); see *Lynch* v. *State*, 348 Conn. 478, 528, 308 A.3d 1 (2024).

"In *Porter*, this court followed the United States Supreme Court's decision in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and held that scientific evidence should be subjected to a flexible test, with differing factors that are applied on a case-by-case basis . . . . A *Porter* analysis involves a two part inquiry that assesses the reliability and relevance of the witness' methods. . . . First, the party offering the expert testimony must show that the expert's methods for reaching his conclusion are reliable. A nonexhaustive list of factors for the court to consider include: general acceptance in the relevant scientific community; whether the methodology underlying the scientific evidence has been tested and subjected to peer review; the known or potential rate of error; the prestige and background

State *v.* Dabate

of the expert witness supporting the evidence; the extent to which the technique at issue relies [on] subjective judgments made by the expert rather than on objectively verifiable criteria; whether the expert can present and explain the data and methodology underlying the testimony in a manner that assists the jury in drawing conclusions therefrom; and whether the technique or methodology was developed solely for purposes of litigation. . . . Second, the proposed scientific testimony must be demonstrably relevant to the facts of the particular case in which it is offered, and not simply be valid in the abstract. . . . Put another way, the proponent of scientific evidence must establish that the specific scientific testimony at issue is, in fact, derived from and based [on] . . . [scientifically valid] methodology. . . .

"[C]onsistent with the *Daubert* test . . . the focus of a validity assessment must be solely on principles and methodology, not on the conclusions that they generate. . . . So long as the methodology underlying a scientific opinion has the requisite validity, the testimony derived from that methodology meets the *Daubert* threshold for admissibility, even if the judge disagrees with the ultimate opinion arising from that methodology, and even if there are other methodologies that might lead to contrary conclusions. . . . Accordingly, although the trial court properly serves a gatekeeper function to ensure that the evidence is sufficiently reliable . . . it should . . . deem scientific evidence inadmissible only when the methodology underlying such evidence is . . . incapable of helping the fact finder determine a fact in dispute." (Citations omitted; internal quotation marks omitted.) *Lynch* v. *State*, supra, 348 Conn. 528–29.

We conclude that the trial court did not abuse its discretion in applying the relevant *Porter* factors and finding the data from the victim's Fitbit sufficiently

State *v.* Dabate

reliable to be admissible scientific evidence.[28] The court reasonably credited Diaz' testimony about his clinical research, which was funded through a grant from the National Institutes of Health, to establish the accuracy of Fitbit devices, and, specifically, Fitbit One, the Fitbit model that the victim wore on the day of the murder. Diaz, who is the director of the Wearable Device Reading Center at Columbia University Medical Center, spoke extensively about his research, describing the "validation study" and its finding that the Fitbit device is very accurate at measuring steps; indeed, it is more accurate than a research grade device, the Actical, at measuring both steps and energy expenditure. Diaz also described the publication and peer review process that supported the validation study. Diaz explained his review of the many other published studies regarding the accuracy rate of Fitbit One. Diaz indicated that the most accurate measurement is obtained when the Fitbit is worn on the hip, as the victim in the present case wore hers. Although he did not test the specific Fitbit worn by the victim, the trial court nonetheless allowed Diaz to offer expert testimony as to the accuracy of Fitbit devices in general.

The defendant argues that Diaz did not establish the reliability of the Fitbit evidence because he could not explain the Fitbit's proprietary internal algorithm that translates the voltage into steps. We disagree. An expert witness does not need knowledge of proprietary information to establish the reliability of data generated by an electronic device.[29] See, e.g., *United States* v. *Mor-*

---

[28] The state argues that evidence from the victim's Fitbit constituted electronic records and was admissible without a *Porter* hearing. Having concluded that the trial court did not abuse its discretion when it admitted the data from the victim's Fitbit after a *Porter* hearing, we need not address this argument. But cf. *State* v. *Burch*, 398 Wis. 2d 1, 18–20, 961 N.W.2d 314 (2021) (trial court did not abuse its discretion when it admitted Fitbit data without expert testimony to establish reliability of underlying technology), cert. denied, U.S. , 142 S. Ct. 811, 211 L. Ed. 2d 503 (2022).

[29] The defendant additionally argues that the Fitbit evidence is unreliable because Diaz' testimony was based on an insufficient amount of data; he

State *v.* Dabate

*gan*, 45 F.4th 192, 203 (D.C. Cir.) ("Even if [the expert witness] could not explain the inner workings of the software that generated the [drive test maps], he could [ensure] the reliability of his drive test and the maps it generated through other means. . . . His inability to explain a proprietary algorithm did not pose a categorical bar to a finding of reliability."), cert. denied, U.S. , 143 S. Ct. 510, 214 L. Ed. 2d 290 (2022); *United States* v. *Chiaradio*, 684 F.3d 265, 277–78 (1st Cir.) (expert witness had sufficient specialized experience to establish reliability of computer program developed by Federal Bureau of Investigation as investigatory tool, even though he was not programmer, did not know program's authors, and never had seen program's source code), cert. denied, 568 U.S. 1004, 133 S. Ct. 589, 184 L. Ed. 2d 386 (2012); *State* v. *Foreman*, 288 Conn. 684, 725, 728–29, 954 A.2d 135 (2008) (concluding that state met foundational standards, despite expert witnesses' lack of knowledge regarding proprietary information). Diaz' testimony established that most fitness trackers operate in a similar fashion, in that they sense motion in three planes and then apply algorithms to those detected motions to calculate the step count or exercise minutes.

Given the ample evidence in the record to support the trial court's findings that Diaz' professional credentials qualified him as an expert, that his Fitbit study had been subject to peer review, that the Fitbit was generally accepted in the scientific research community and had been tested extensively and deemed accurate, and that the Fitbit had been developed for extrajudicial purposes, we conclude that the trial court did not abuse its discretion by admitting the data from the victim's Fitbit.

---

reviewed only a single page of data, which included a list of minute-by-minute times in one column and steps in the other column. We agree with the state that this argument is a challenge to the weight of the evidence, rather than to its admissibility.

State *v.* Dabate

## III

### VIOLATION OF *MIRANDA* RIGHTS CLAIM

The defendant's final claim is that the trial court improperly denied his motion to suppress his statement to the police during the hospital interview. He argues that the interview was a custodial interrogation conducted without *Miranda* warnings. In support of this claim, the defendant (1) challenges two of the trial court's factual findings underlying its determination that he was not in custody for purposes of *Miranda* during the interview, and (2) argues that the trial court improperly determined as a matter of law that he was not in custody for purposes of *Miranda*. We disagree.

Following an evidentiary hearing, the trial court found the following facts relevant to the defendant's motion to suppress. On December 23, 2015, at approximately 11:40 a.m., the defendant arrived at Hartford Hospital's emergency department seeking treatment for multiple injuries sustained during an alleged home invasion. At the hospital, he was placed in an observation room for his injuries, which consisted of several small, shallow leg puncture wounds, a chest wound, and a cut finger. Shortly after 1 p.m., Detectives Payette and Langemin from the Connecticut State Police arrived to interview the defendant. The detectives were dressed in plain khaki pants and polo shirts, but were identifiable as state police officers. They were also armed but did not display their weapons. Upon identifying themselves, they began to question the defendant about what had happened at his home, believing that he was a victim or witness.

After approximately one hour of questioning, the defendant and the detectives moved to a second room. The detectives asked the defendant to describe the events of the morning. He was "responsive, giving every indication that he wanted to tell the detectives what had

State *v.* Dabate

happened.'' The defendant was not under the influence of alcohol, medication, or narcotics, and ''did not appear to be emotional.'' The defendant's hospital room door was never locked, although it was occasionally closed. The defendant was neither restrained nor handcuffed, although he was attached to an IV for a portion of the interview. The defendant responded appropriately to questions and spontaneously volunteered information. The hospital staff interrupted the interview several times to provide medical care to the defendant.

During the interview, a nurse stated in front of the defendant: ''His family is here.'' Within earshot of the defendant, a physician also asked the detectives if the defendant was leaving with them. The detectives responded that the defendant was leaving with ''[h]is family, who is going to be here. I think they went out to get a coffee or something like that.'' During the interview, the defendant disclosed that he was involved in an extramarital affair and that his mistress was having his child. He also stated that he did not want his family to hear certain information that had been elicited during the interview.

The detectives prepared a written statement. The defendant read the written statement, making corrections and adding additional details to it. The detectives and the defendant then reviewed the statement at least three additional times before the defendant signed it.

At approximately 7 p.m., the hospital staff informed the defendant that he would be discharged from the hospital. After he was discharged, hospital personnel provided a third room for the defendant and the detectives to continue their conversations. In this third room, the detectives began to question the defendant about certain inconsistencies in his written statement. While in the third room, one of the detectives again stated that the defendant's ''family is right down the hall.'' After

State *v.* Dabate

approximately thirty minutes, the defendant stated: "I didn't think I had to ask for a lawyer." Soon thereafter, he said: "[D]o I have to ask for a lawyer now?" When the detectives continued to question him, the defendant stated: "I'm gonna need to get a lawyer." At that point, the detectives stopped their questioning. The detectives did not arrest the defendant, and he left the hospital.

After the evidentiary hearing, the trial court denied in part the defendant's motion to suppress but granted it with respect to the statements the defendant made in the third room. The court applied a totality of the circumstances analysis and found that the defendant's statements were part of a noncustodial and voluntary interview. The court found that "[t]he defendant did not appear to be emotional" and that "the detectives did not employ threats, tricks, ruses, or lies" in their interview of the defendant. The court further found that the tone during the interview was conversational, the defendant was not under the influence of alcohol, medication, or narcotics, the interview's atmosphere was not intimidating, there was no evidence that the defendant was restrained during the interview, and the defendant was free to move about and to leave.

With respect to the statements the defendant made after he had been moved to the third room, the trial court, after finding that the defendant was not in custody and that the statements were voluntary, suppressed them because the defendant had clearly invoked his right to counsel when he indicated on three separate occasions that he probably should speak with an attorney.

Our review of the defendant's claim is informed by the following principles. "Although [a]ny [police] interview of [an individual] suspected of a crime . . . [has] coercive aspects to it . . . only an interrogation that occurs when a suspect is in custody heightens the risk

State *v.* Dabate

that statements obtained therefrom are not the product
of the suspect's free choice. . . . This is so because
the coercion inherent in custodial interrogation blurs
the line between voluntary and involuntary statements
. . . . Thus, the court in *Miranda* was concerned with
protecting defendants against interrogations that take
place in a [police dominated] atmosphere, containing
inherently compelling pressures [that] work to under-
mine the individual's will to resist and to compel [the
individual] to speak . . . . [P]olice officers [however]
are not required to administer *Miranda* warnings to
everyone whom they question . . . rather, they must
provide such warnings only to persons who are subject
to custodial interrogation. . . . To establish entitle-
ment to *Miranda* warnings, therefore, the defendant
must satisfy two conditions, namely, that (1) [the defen-
dant] was in custody when the statements were made,
and (2) the statements were obtained in response to
police questioning." (Citations omitted; footnote omit-
ted; internal quotation marks omitted.) *State* v. *Man-
gual*, 311 Conn. 182, 191–92, 85 A.3d 627 (2014).

"[C]ustody is a term of art that specifies circum-
stances that are thought generally to present a serious
danger of coercion. . . . In determining whether a per-
son is in custody in this sense . . . the United States
Supreme Court has adopted an objective, reasonable
person test . . . the initial step [of which] is to ascer-
tain whether, in light of the objective circumstances of
the interrogation . . . a reasonable person [would not]
have felt . . . at liberty to terminate the interrogation
and [to] leave. . . . Determining whether an individu-
al's freedom of movement [has been] curtailed, how-
ever, is simply the first step in the analysis, not the last.
Not all restraints on freedom of movement amount to
custody for purposes of *Miranda*. [Accordingly, the
United States Supreme Court has] decline[d] to accord
talismanic power to the [freedom of movement] inquiry

State *v.* Dabate

. . . and [has] instead asked the additional question [of] whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*.'' (Citations omitted; internal quotation marks omitted.) Id., 193.

In considering whether a defendant was in custody for *Miranda* purposes, we scrupulously examine the record to ensure that the trial court's factual findings are supported by substantial evidence. See, e.g., id. 197. ''[W]e are bound to accept the factual findings of the trial court unless they are clearly erroneous'' but have ''plenary review over the ultimate issue of custody.'' Id.

A

Factual Findings

The defendant challenges a number of the factual findings underlying the trial court's custody determination. First, the defendant challenges the finding that he ''did not appear to be emotional.'' He claims that this finding is contradicted by the fact that he asked the hospital for drugs ''to help him calm down'' and that he was experiencing a panic attack that ''shows he was emotionally and mentally on edge and fearful of being alone . . . .'' Second, the defendant challenges the findings that ''the detectives did not employ any tricks or ruses, and [that] the defendant was aware his family was present.'' The defendant claims that the detectives withheld the fact that his family was present to ''isolate the frightened defendant from his family,'' and, because he felt alone, he was ''mentally and emotionally unlikely to ask [the detectives] to leave.'' We conclude that there was ample evidence in the record to support the trial court's factual findings.

The trial court based its finding that the defendant ''did not appear to be emotional'' on the detectives' testimony and on the audio recording of the defendant's

State *v.* Dabate

interview, in which he displayed little emotion while describing the victim's murder. Although the defendant argues that his request for medication to calm him down, along with a panic attack that he experienced while left alone, contradict this factual finding, we are not persuaded that the court's finding was clearly erroneous. The court not only relied on the detectives' testimony but also reviewed the actual audio recording of the interview with the defendant in making this determination. We are not left with a definite and firm conviction that a mistake has been committed. Rather, "[i]t is within the province of the trial court, when sitting as the fact finder, to weigh the evidence presented and [to] determine the credibility and effect to be given the evidence." (Internal quotation marks omitted.) *State* v. *Thompson*, 305 Conn. 412, 435–36, 45 A.3d 605 (2012), cert. denied, 568 U.S. 1146, 133 S. Ct. 988, 184 L. Ed. 2d 767 (2013); see *State* v. *Lawrence*, 282 Conn. 141, 156, 920 A.2d 236 (2007) ("[w]e defer to the trial court's assessments concerning credibility, and, therefore, conclude that the evidence was sufficient to support the trial court's finding").

Similarly, the trial court's findings that the detectives did not use any tricks or ruses, and that the defendant was aware that his family was present are equally supported by the record. The recording of the hospital interview indicates that the detectives, within earshot of the defendant, stated to a nurse: "His family, who is going to be here. I think they went out to get a coffee or something like that." The defendant's apparent awareness of his family's presence is confirmed by his express statement to the detectives that he did not want his family to know some of the information regarding his extramarital affair. We disagree with the defendant that these findings were not supported by the record insofar as the detectives lied to him by stating that his family had left for coffee, as the audio recording of the inter-

State *v.* Dabate

view shows that the detectives were told that the defendant's family had arrived but were not told that they had left for any reason. This argument is belied by the ample evidence that the defendant knew that his family was present and that the detectives did not use tricks or ruses. Therefore, we conclude that the defendant's claims challenging the trial court's factual findings are without merit.[30]

B

Custody Determination

Finally, we turn to the defendant's claim that he was subject to a custodial interrogation without the required *Miranda* warnings because he reasonably believed that he was not free to leave the hospital room. The defendant relies on the Appellate Court's decision in *State* v. *Garrison*, 213 Conn. App. 786, 804–805, 278 A.3d 1085 (2022), rev'd, 350 Conn. 61, 323 A.3d 279 (2024). He argues that the interview that took place in the present case was more intense than that in *Garrison* because it lasted more than six hours and offered "shorter and fewer breaks in between." In response, the state distinguishes this case from *Garrison* because the Appellate Court's decision in that case hinged on the fact that the defendant was unable to leave the hospital until he was sober, with five police officers present for the interview, rather than two in the present case. We agree with the state and conclude that the defendant was not in custody when he was interviewed by the detectives at the hospital.

In assessing the totality of the circumstances and determining if an individual is in custody for purposes of *Miranda*, we consider numerous nonexclusive factors:

---

[30] We pause to note that, even if we were to agree with the defendant that these factual findings were clearly erroneous, they ultimately played only a slight role in the trial court's determination that the defendant was not in custody.

State *v.* Dabate

"(1) the nature, extent and duration of the questioning; (2) whether the suspect was handcuffed or otherwise physically restrained; (3) whether officers explained that the suspect was free to leave or not under arrest; (4) who initiated the encounter; (5) the location of the interview; (6) the length of the detention; (7) the number of officers in the immediate vicinity of the questioning; (8) whether the officers were armed; (9) whether the officers displayed their weapons or used force of any other kind before or during questioning; and (10) the degree to which the suspect was isolated from friends, family and the public." *State* v. *Mangual*, supra, 311 Conn. 196–97.

In a hospital setting, additional considerations inform our determination of whether a defendant is in custody while being questioned by the police. These include (1) "whether the police physically restrained the defendant in any way or ordered the medical attendants to restrain him physically," (2) "whether the police took advantage of an inherently coercive situation created by any physical restraint that the medical attendants may have asserted against him for purposes of his treatment," (3) "whether the defendant was able to converse with . . . other people, [to] express annoyance or [to] request assistance from them," (4) "the duration of the questioning," (5) "whether the police took a criminal suspect to the hospital from the scene of a crime, monitored the patient's stay, stationed themselves outside the [hospital room] door, [or] arranged an extended treatment schedule with the doctors," (6) "the time of day," (7) "the mood and mode of the questioning," (8) "whether there were indicia of formal arrest," and (9) "the defendant's age, intelligence and mental makeup." (Internal quotation marks omitted.) *State* v. *Jackson*, 304 Conn. 383, 417–18, 40 A.3d 290 (2012).

In *State* v. *Garrison*, 350 Conn. 61, 323 A.3d 279 (2024), this court applied the factors discussed in *Man-*

State *v.* Dabate

*gual* and *Jackson*, and held that the defendant was not in custody in his hospital room because a reasonable person "would not have felt that there was a restraint on his freedom of movement of the degree associated with a formal arrest." Id., 85. The defendant in *Garrison* was hospitalized for an injury to his nose following a physical altercation during which he had stabbed the man who punched him. Id., 64. He was then questioned for approximately one hour by five different police officers but did not receive *Miranda* warnings. Id., 65. The defendant, whose blood alcohol content measured 0.217, was described as "alert, awake, and oriented"; (internal quotation marks omitted) id.; and responded "spontaneously, eagerly, and immediately, often launching into long narratives of the event and having to be redirected and asked to slow down." (Internal quotation marks omitted.) Id., 74. The officers did not arrest the defendant at the end of the hospital stay; id., 76; and did not ask the medical staff to stay out of the room or to stop administering the defendant's treatment while they spoke with him. Id., 81. The defendant was not kept from friends or family; id., 80; and had the opportunity to converse with, express annoyance at, and request assistance from the nurses and doctors. Id., 78. We, therefore, concluded that the defendant was not restrained to a degree associated with a formal arrest so as to require *Miranda* warnings. Id., 85.

We conclude that the totality of the circumstances[31] establishes that the defendant in the present case was not in custody for purposes of *Miranda* because it is clear from the record that a reasonable person would have felt at liberty to terminate the interview. We find most persuasive that the defendant acquiesced to each

---

[31] This court's practice has been to examine each individual factor in our custody analysis. Despite doing so, however, we note that, at times, only a few of the factors may be applicable and that even one factor may be compelling enough to contravene or compel a finding of custody.

State *v.* Dabate

interaction and gave every indication that he wanted
to tell the detectives what had happened. See *State* v.
*Brandon*, 345 Conn. 702, 739, 287 A.3d 71 (2022) ("weight
[of fourth *Mangual* factor] is undercut . . . by the
defendant's acquiescence to the meeting"), cert. denied,
      U.S.     , 143 S. Ct. 2669, 216 L. Ed. 2d 1242 (2023).
This is particularly persuasive when there is no indica-
tion in the record that the defendant, who was never
restrained or handcuffed, was ever told that he was not
free to terminate the interview or that he was under
arrest; indeed, the detectives told him the opposite.[32]
Additionally, this point severely undermines the strong-
est argument for a finding of custody: that the interview
lasted over a period of six hours. As evident from the
record, the defendant, for a majority of the interview,[33]

---

[32] The defendant claims that, although he was told that *he* was legally free
to leave, he was never actually told that he was free *to ask the detectives
to leave*, which was "the way in which [the defendant] could end the interro-
gation." We disagree. "[A] defendant need not be expressly informed that
he [is] free to leave in order for a court to conclude that the defendant has
failed to prove that an interrogation was custodial." (Internal quotation
marks omitted.) *State* v. *Brandon*, supra, 345 Conn. 736; see *State* v. *Green-
field*, 228 Conn. 62, 71–72 n.10, 634 A.2d 879 (1993) ("[a]lthough the police
[did not expressly inform the defendant that he was free to leave at the
outset of the interview], the trial court could reasonably have found that
both [the police] and the defendant understood that their meeting was
consensual, and therefore the defendant did not need to be expressly
informed that he was free to leave"). The detectives in the present case did
not need to expressly tell the defendant that he could *ask* them to leave
because they had informed him that he was free to leave.

The defendant also claims that he did not feel at liberty to leave because
one of the detectives told him, "sorry you can't get up." (Internal quotation
marks omitted.) When read in the context of the entire interview, however,
we disagree with the defendant's characterization of the statement. During
the suppression hearing, Langevin clarified that, after he went for a walk,
he reentered the defendant's room and apologized because "[he] felt bad
that [the defendant] was what appeared to be restricted to the bed [due to
his injuries and his medical treatment]." This is supported by the fact that,
during the hospital interview, the defendant responded to Langevin's com-
ment by stating: "That's okay. Thanks for coming back." This interpretation
is also bolstered by the audio recording of the interview, which clearly
portrays Langevin's expression of sympathy for the defendant.

[33] We acknowledge that, during extended interactions, the tone of the
interaction may change, rising to the level of a custody finding when there
may not have previously been such a finding. See *State* v. *Brandon*, supra,

State *v.* Dabate

felt at ease and was comfortable sharing his story, even pausing to clarify it or to add extraneous details. As such, a reasonable person, and the defendant in this case, would have felt at liberty to leave.

After reviewing the totality of the circumstances with respect to the portion of the hospital interview that took place prior to the defendant's move to the third room, we conclude that a reasonable person in the defendant's position would not have felt that there was a restraint on his freedom of movement of the degree associated with a formal arrest. As such, we agree with the trial court's determination that the defendant was not in custody while at the hospital and that the detectives were not required to administer *Miranda* warnings prior to interviewing him there.

The judgment is affirmed.

In this opinion the other justices concurred.

---

345 Conn. 751 (*D'Auria, J.*, concurring in part and concurring in the judgment). Given that the trial court ultimately suppressed the portion of the interview that took place in the third room, we conclude that our totality of the circumstances analysis makes clear that the tone of the interaction did not change while the defendant remained in the first and second rooms. This is evident given that the detectives did not begin to question the defendant regarding the inconsistencies in his story until they entered the third room.